ISAAC W. CARR, Doing Business under the Firm Name of I. W. CARR COMPANY, Respondent, *v.* THE LONG ISLAND RAILROAD COMPANY, Appellant.

(Supreme Court, Appellate Term, First Department, March, 1918.)

Carriers — bills of lading — damages — contracts — judgments — appeal.

Where plaintiff, aware of an impending strike of the employees of all the railroads of the United States immediately after Labor Day, September 4, 1917, delivered a car-load of potatoes to defendant on the afternoon of September first for

shipment under a bill of lading which provided that the carrier was not bound to transport the property otherwise "than with reasonable dispatch," and it appears that though in normal times and under normal conditions the car should have reached its destination in about twenty hours, yet because of a congestion of freight due to the threatened strike and the over-taxing of the classification yard said car, with others, shipped from the same point reached its destination on September third and was placed for delivery at six-fifteen A. M. on that same morning, a judgment in favor of plaintiff for damages alleged to have been caused by failure to deliver the potatoes in contract time will be reversed and the complaint dismissed upon the merits.

MULLAN, J., dissents.

APPEAL by the defendant from a judgment of the Municipal Court of the city of New York, borough of Manhattan, first district, rendered in favor of the plaintiff.

Joseph F. Keany (Dominic B. Griffin, of counsel), for appellant.

Glaze & Fine (Samuel Fine, of counsel), for respondent.

WEEKS, J. The action was commenced by service of a summons upon which was indorsed a statement that the action was for damages caused by failure to deliver potatoes within contract time and the bill of particulars stated that plaintiff's damage resulted from defendant's failure to ship the goods to him within contract time.

On August 31, 1917, the plaintiff being aware of a threatened strike of the employees of all the railroads in the United States immediately after Labor Day, September fourth, and anticipating that if the railroads were shut down there would be an advance in the price of commodities, purchased a car-load of potatoes at Laurel, L. I., which were delivered on the

43

afternoon of September first to the defendant for shipment to Bushwick, L. I., under a bill of lading containing the following clause: "No carrier is bound to transport said property by any particular train or vessel or in time for any particular market, or otherwise than with reasonable dispatch."

The usual time for the transportation of freight from Laurel to Bushwick in normal times and under normal conditions was approximately twenty hours. Freight trains consisted of about forty cars and were run over a single-track road for about sixty-six miles to Hicksville and then about fifteen miles over a double-track road to the Holban classification yard at Jamaica where the cars were weighed and classified and the cars consigned to the Bushwick station were then sent forward about ten miles to that terminal, stopping at Bushwick Junction for orders.

The plaintiff's agent testified that he called at the Bushwick station on Saturday September second, and again on the morning of Labor Day, September fourth, when he remained until the yard closed at noon but did not see the car on the delivery track and was unable to get the car until seven o'clock in the morning of September fifth.

The witnesses for the defendant testified that the car in question moved from Laurel about twelve-thirty P. M. on September first on the regular daily westbound freight; that the Holban classification yard was then congested with an abnormal supply of freight due to the threatened strike and the capacity of the yard was overtaxed to the extent of 150 or 200 cars which were being held back in the leads because they could not handle them at the classification tracks; that the car in question, together with two other cars of potatoes from Laurel, reached Bushwick on Sunday morning, September third, and were

placed for delivery in the yard at six-fifteen o'clock on that same morning.

Even if the claim of plaintiff be conceded that the car did not reach the Bushwick yard until after noon of September fourth, which was a holiday, we are unable to agree with the learned trial justice that there was a breach of the contract of defendant to transport the potatoes with "reasonable dispatch."

As stated in *Wibert* v. *New York & Erie R. R. Co.*, 12 N. Y. 245, 249: "What is a reasonable period, must depend upon the actual circumstances existing at the time the property is offered for transportation. * * * when the goods are actually delivered at the place of destination, and the complaint is only of a late delivery, the question is simply one of reasonable diligence, and accident or misfortune will excuse him, unless he has expressly contracted to deliver the goods within a limited time. * * * The defendants were without fault in respect to the state of their roads; they had provided sufficient cars and engines and sent forward as many freight trains as safety would permit, but owing to an unusual demand for transportation at that time, the plaintiffs' property could not be sent forward faster than it was sent. If, under such circumstances, a railroad company would be liable on account of a tardy delivery, the business would be quite too hazardous to be followed by prudent men."

The plaintiff was well aware of the existing conditions and he admittedly made the purchase and shipment in order to take advantage of the situation already created or to be created by the threatened strike. He testified that the potato market had been gradually rising for a week; that the shipment was made to take advantage of a highly inflated market and that conditions were not normal. His knowledge was not personal or individual but he stated that the

threatened strike was a subject of general discussion, creating a state of excitement throughout the country. The announcement that a nation-wide railroad strike would be called on a day fixed unless an adjustment of differences was reached was just as certain to produce an abnormal advance shipment as it was to produce higher prices for commodities.

The same condition which created an inflated market naturally produced a congestion of freight. There was no discrimination against the plaintiff or in favor of other shippers. The other cars shipped between the same points reached their destination at the same time as plaintiff's car.

The conclusion which we have reached makes it unnecessary to consider the question as to the rule of damages under the special provision of the bill of lading.

For the reasons stated the judgment should be reversed, with thirty dollars costs, and the complaint dismissed upon the merits, with costs in the court below.

GUY, J., concurs.

MULLAN, J. (dissenting). The ultimate question for the decision of the trial judge was whether the goods were forwarded with reasonable dispatch. The conceded delay was sufficiently great to put the defendant carrier to its explanation, and the explanation offered did not, in the opinion of the court, excuse the delay. There was much talk of congestion, and of an impending strike, but there is nothing that I can find to show that the congestion could not have been avoided by the exercise of ordinary care, or that it was responsible for so great a delay in the delivery of these goods, or for any delay in their delivery. The decision of the question of fact involved was peculiarly for the justice who, sitting without a jury,

was the trier of the facts, and his finding was amply warranted and should not be disturbed. Accordingly, I vote for affirmance.

Judgment reversed, with costs.